UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil Action No. 4:06-CV-00076-F

| | | |
|---|---|---|
| HWA-YONG JO,<br>HUN-YONG JO,<br><br>     Plaintiffs<br><br>v.<br><br><br>PISTON MANUFACTURING, INC.,<br>a/k/a PISTON MODULAR ASSEMBLY,<br>INC., a Michigan Corporation, and<br>VINCENT JOHNSON<br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br><br><u>ORDER</u> |

This matter is before the court on Defendants' Motion for Summary Judgment [DE-72]. Plaintiffs, Hwa-Yong Jo and Hun-Yong Jo have responded [DE-83], Defendants have replied [DE-94] and Plaintiffs have filed a sur-reply [DE-102]. The matter is now ripe for disposition.

## I. <u>STATEMENT OF THE CASE</u>

This case arises out of the January 2004 sale of Custom Molders, Inc., ("Custom Molders"), a North Carolina corporation, formerly owned by Plaintiffs Hwa-Yong Jo and Hun-Yong Jo ("Plaintiffs" or "Jo Brothers") to Piston Manufacturing, Inc. ("PMI"), a Michigan corporation owned by Defendant Vincent Johnson. In early March 2005, Plaintiffs, the Jo Brothers, filed a complaint against both corporations, Custom Molders and PMI, in North Carolina state court for the recovery of the outstanding balance owed to Plaintiffs on a promissory note executed by the parties in favor of the Jo Brothers in order to facilitate the 2004 leveraged buyout purchase of Custom Molders by PMI.

On March 18, 2005, the Superior Court Division in Durham County, North Carolina, entered an order of summary judgment ("State Court Judgment") in favor of Plaintiffs for the unpaid principal sum owed on the promissory note, plus interest accrued, as well as attorneys fees, for the total amount of $4,494,189,10. Aff. in Opp'n [DE-86], Ex. X.

Later in 2005, after attempts to collect on the State Court Judgment proved unsuccessful, Plaintiffs petitioned the bankruptcy court to commence an involuntary Chapter 7 liquidation of Custom Molders. Def.'s Mem. in Supp. [DE-73], p. 13; *see In re Custom Molders Incorporated,* Case No. 05-01858-5-ATS (Bankr., E.D.N.C.).

On March 8, 2006, Plaintiffs filed another state action, this time in Wake County, North Carolina, General Court of Justice, Superior Court Division, demanding a jury trial and seeking to recover on the prior State Court Judgment, as well as under North Carolina's Unfair and Deceptive Trade Practice statute, N.C. Gen. Stat. § 75-16.1. Notice of Removal [DE-1] Ex. A, Compl. In the new state action, Plaintiffs named both PMI, corporately, and Vincent Johnson, individually, as defendants, as they sought to recover the unpaid State Court Judgment by piercing the corporate veil and collecting directly from Johnson. [DE-1], Ex. A, Compl. ¶ 1.

On April 7, 2006, PMI, a/k/a Piston Modular Assembly, Inc. ("PMI") and Vincent Johnson ("Johnson") (collectively "Defendants") noticed the removal of Plaintiffs' 2006 state court complaint [DE-1] based on 28 U.S.C. § 1332 and 28 U.S.C. § 1441 *et seq.* On May 4, 2006, Defendants filed their answers to Plaintiffs' complaint. PMI Answer [DE-4]; Johnson Answer [DE-5]. Thereafter, a discovery scheduling order was set on July 5, 2006, by United States Magistrate Judge William A. Webb, with discovery due by March 3, 2007, and motions by April 30, 2007.

On January 19, 2007, Defendants filed a Motion for Protective Order [DE-18], allowed by USMJ Webb on January 23, 2007 [DE-22]. On February 28, 2007, the matter was referred to USMJ James Gates for any future motions [DE-33]. On May 29, 2007, USMJ Gates heard Defendants' Motion for Protective Order [DE-18] and Plaintiffs' Motions to Compel Discovery Responses [DE-23, DE-37] and on July 9, 2007, entered an order denying Defendants' Motion for Protective Order, and allowing Plaintiffs' Motions to Compel, and awarding attorneys' fees and other expenses to Plaintiffs. [DE-48]. On August 15, 2007, the undersigned entered an order [DE-58] denying Defendants' January 19, 2007, Motion for Judgment on the Pleadings [DE-20] as to Plaintiffs' second cause of action for Unfair and Deceptive Trade Practices pursuant to North Carolina General Statute, Chapter 75-1.1.

Following the conclusion of discovery, Defendants filed their instant Motion for Summary Judgment [DE-72] and supporting memorandum [DE-73] on April 4, 2008, arguing that no genuine issues of material fact exist and that judgment as a matter of law in their favor therefore is appropriate. On May 12, 2008, Plaintiffs filed their Memorandum in Opposition [DE-83] to Defendants' Motion for Summary Judgment. On May 22, 2008, Defendants filed their Reply [DE-94], and on June 16, 2008, this court allowed Plaintiffs leave to file a sur-reply, subsequently filed the same day [DE-102]. Plaintiffs' sixty-eight page complaint alleges two causes of action in hopes of recovering the amount owed them under the State Court Judgment, a common law claim under Michigan law for piercing the corporate veil, and a statutory claim under North Carolina's Unfair and Deceptive Trade Practices Act.

## II. **STATEMENT OF THE FACTS**

The parties in this case consist of experienced businessmen and corporations operating in the automotive arena. Plaintiffs, the Jo Brothers, are from Korea, educated in the United States, and both, at one time, worked as engineers for Ford Motor Company ("Ford"). In early 1991, the Jo Brothers became aware of, and made a business decision to purchase, one of Ford's plastic component suppliers, Custom Molders. Dep. of Hwa-Yong Jo [DE- ] p. 83.[1] Thereafter, in 1991, the Jo Brothers purchased Custom Molders in a leveraged buyout transaction, leveraging all of Custom Molders's assets as a part of the financing for the sale. *Id.* at pp. 86-87.

After purchasing the company, the Jo Brothers continued the operation of Custom Molders as a plastic injection molding company, supplying major automotive companies with various automotive parts for the companies' vehicles. Undisputedly, Ford was one of, if not Custom Molders's most prominent customers, both in volume and in profitability. Mem. in Supp. Def.'s Mot. for Summ. J. [DE-72] p. 7; Pl.'s Mem. in Opp'n [DE-83] p. 3. Unlike many plastic injection molding companies, which customarily possess only manufacturing capabilities, Custom Molders possessed both manufacturing and design capabilities. Aff. Hwa-Yong Jo [DE-86], at ¶ 5 ("Aff. Hwa-Yong"). Because Custom Molders possessed both capabilities, the company earned Ford's Full Service Supplier designation. *Id.* at ¶ 9. This designation earned Custom Molders one of the 200 spots as a global supplier eligible to work on future Ford programs. *Id.* at ¶¶ 12-14.

---

[1] The full deposition of Hwa-Yong Jo will be filed contemporaneously with this Order and provided a [DE- ] number at that time for ease of reference.

4

In the late 1990s, the Jo Brothers began establishing procedures to protect Custom Molders's growing intellectual property, created as a result of Custom Molders' design capabilities. To further that effort, on June 15, 1999, Custom Molders entered into a Patent Agreement with frequent intellectual collaborators. Aff. Hun-Yong Jo [DE-97], at ¶ 21 ("Aff. Hun-Yong"). As a result of the Patent Agreement, Custom Molders enjoyed exclusive rights to make and sell certain automotive parts. *Id.*, Aff. Hwa-Yong at ¶ 21.

One of these automotive parts designed by Custom Molders, and included in the Patent Agreement, was a fan shroud in which Ford had showed some interest because it would provide more efficient engine cooling to the F-150 pickup truck. Aff. Hun-Yong at ¶¶ 25-28. According to the Jo Brothers, this design, named the Double Barrel Fan Shroud, would produce $4,000,000 in annual savings for Ford because of its increased efficiency. *Id.* at ¶¶ 27-28. Pursuant to the Patent Agreement, Custom Molders would maintain exclusive rights to manufacture the Double Barrel Fan Shroud. *Id.* at ¶ 30; [DE-97], Ex. B. Custom Molders began manufacture of the Double Barrel Fan Shroud for Ford in 2003, before the sale of Custom Molders to PMI. *Id.* at ¶ 29.

The term of trade for the equipment used to manufacture the Double Barrel Fan Shroud is "Tools." *Id.* at ¶ 34 ("In the context of fan shrouds, the term "tools" refers to a complex piece of steel equipment and molds."). Although part of the design of the Double Barrel Fan Shroud is reflected by these Tools, and thus the Tools themselves represent actual intellectual property, the ultimate purchaser of the Tools is the automotive

manufacturer, for example, Ford. *Id.* at ¶¶ 34-35; July 10, 2008 Dep. of Sergus Thomas [DE- ], pp. 55-57.[2]

The legal result of this combination appears to be that, while the automotive manufacturer owns the physical Tool, only the patent owner or his legal assignee retains the exclusive right to manufacture that particular part. Aff. Hun-Yong at ¶ 35 ("Although the auto manufacturer owns the tool, to the extent that the intellectual property represented by the tool is protected by the supplier's patent, only the supplier has the right to use the tool [sic] produce the part"); July 10, 2008, Dep. of Sergus Thomas [DE- ] pp. 55-57. For example, while Ford paid for and owned the actual steel from which the Tools were made, the Tools were, in essence, molds from which the actual patented piece of equipment was crafted, and the design of that piece of equipment was protected by a patent. Dep. of Michael Bowe [DE-162], Ex. E, pp. 44-47; July 8, 2008 Dep. of Sergus Thomas [DE- ], pp. 55-57.

According to the Jo Brothers, in addition to the patented technology, the successful manufacture of the Double Barrel Fan Shroud required a finding of optimal manufacturing techniques, recorded in a type of "Process Book/Job Packet," and referred to as a "Birth Book." Aff. Hun-Yong Jo at ¶ 32. Plaintiffs allege that these Birth Books are recognizable as trade secrets to be guarded closely. *Id.* at ¶ 33.

In addition to providing Ford with the Double Barrel Fan Shroud, in the mid 1990s, the Jo Brothers began designing a new Front End Cooling Module for Ford trucks, in an

---

The full July 10, 2008 deposition of Sergus Thomas will be filed contemporaneously with this Order and provided a [DE- ] number at that time for ease of reference.

6

effort to increase assembly efficiency. Aff. Hwa-Yong at ¶¶ 14-15. According to the Jo Brothers, the Truck Engineering department at Ford was interested in the Front End Cooling Module, but could not implement the concept as a result of a Union dispute.[3] Aff. Hun-Yong at ¶ 37.

In the fall of 2002, Greg Ramfos ("Ramfos") and Nick Morgan ("Morgan"), two Ford representatives from the Truck Engineering Department, visited Custom Molders to discuss what concepts Custom Molders had that would benefit Ford. *Id.* at ¶ 39. According to the Jo Brothers, Ramfos and Morgan were impressed with the Front End Cooling Module and also the Fluid Bank System designs, and encouraged the Jo Brothers to continue with the design and development of these parts. *Id.*

During a meeting with Ramfos and Morgan, the Jo Brothers also met with Thomas Chambers ("Chambers"), the President of Piston Automotive, LLC, and discussed the potential for business dealings between Custom Molders and Piston Automotive. Aff. Hun-Yong at ¶ 40. It was during this meeting that the potential purchase of Custom Molders was first discussed with Piston Automotive. *Id.* The Defendants contend that around this same time, in late 2002, Ramfos and Morgan approached Vincent Johnson ("Johnson"), the owner of Piston Automotive, and his advisor with the idea of purchasing Custom Molders from the Jo brothers. [DE-88], Ex. 7, Dep. of Vincent Johnson [DE- ] pp. 53-54. According to the Ford representatives, Custom Molders was a good company, but Ford no longer would be doing business with Custom Molders under its current ownership "because of

---

[3] "The Front End Cooling Module represents a cost savings to Ford because it can be assembled by a supplier's non-union labor and can be attached to the vehicle more rapidly than individually attaching the several component parts of the module." Aff. Hwa-Yong at ¶ 15.

some things that supposedly [the Plaintiffs] did in the past." Mem. in Supp. of Def.'s Mot. for Summ. J. [DE-73], Ex. J; Dep. Vincent Johnson [DE- ], pp. 59-60.

In December 2002, the Jo Brothers met with David Thursfield ("Thursfield"), Ford's Vice President of Global Purchasing, at Thursfield's request in Detroit. Aff. Hun-Yong at ¶ 43. When the Jo Brothers arrived in Detroit, they found Thursfield in a meeting with Chambers and Johnson. *Id.* The Jo Brothers joined this meeting, during which Thursfield encouraged them that, if they planned to sell Custom Molders, to sell it to Johnson. *Id.* After discussing a potential sale, the Jo Brothers and Johnson shook hands on a deal to sell Custom Molders to Johnson for approximately $10,000,000. *Id.* at ¶ 44.

Ultimately, Custom Molders was sold to one of Johnson's companies, PMI. PMI, according to Johnson, was formed by him in the late 1990s. Dep. Vincent Johnson, [DE- ], p. 11. Johnson stated that PMI was formed because Johnson was hoping to buy a manufacturing company and call it "Piston Manufacturing, Inc." or "PMI." *Id.,* p. 12. At the time of its formation, ninety-nine percent of PMI was owned by Johnson as an individual, with the other one percent owned by Piston Automotive – a separate corporation wholly owned by Johnson. *Id.,* p. 16, 31. Johnson was PMI's sole director, and at some point, chairman of PMI as well. *Id.,* p. 33-34.

After its formation, PMI engaged in no business activity because, as explained by Johnson, "it was pretty much a company we wanted the name and once we found a company that we could buy that was going to be the company we were going to use, a manufacturing company we could buy, that was going to be Piston Manufacturing." *Id.,* p. 18. From the facts, it appears Johnson identified that company as Custom Molders, with the sale of Custom Molders to PMI closing on May 6, 2003. Aff. Hwa-Yong at ¶ 20. The

8

Jo Brothers allege that, "[a]lthough Mr. Johnson was to be the purchaser of Custom Molders, closer to the time of the closing he advised that as a matter of business convenience, he wanted to acquire the stock of Custom Molders in a company known as Piston Manufacturing, Inc." *Id* at ¶ 19.

At the closing, the Jo Brothers received approximately half of the $10,114,132[4] purchase price in cash. *Id.* at ¶ 20; [DE-86] Ex. E Stock Purchase Agreement. As part of the financing for the leveraged buy out, PMI made two promissory notes in favor of the Jo Brothers for the balance of the purchase price; the first note was made for $3,631,562, and the second for $1,345,000. Aff. Hwa-Yong at ¶ 20. The Jo Brothers required, as an inherent condition of the sale, that Custom Molders' patent rights be used as security for the first promissory note, in the amount of $3,631,562. *Id.* The second note was secured by real estate. The Jo Brothers' security interest, however, was fully subordinated to the security interests of Standard Federal Bank, who had loaned $9.1 million dollars to effect the sale, using Custom Molders's assets as collateral. *Id.* at ¶ 23; Stock Purchase Agreement, Ex. E [DE-86].

Soon after the purchase of Custom Molders by PMI, in 2004, a breakdown of communications between PMI, Johnson, and the Jo Brothers occurred. William Dickerson ("Dickerson"), President of Custom Molders, stated that the decision no longer to communicate with the Jo Brothers, a decision inapposite to the requirements of the security

---

[4] According to the Stock Purchase Agreement, the purchase price of Custom Molders was $10,950,000, *less* $149,438, consituting one-half of the principal amount and accrued interest of the Sellers' promissory note, *less* $1,200,036.64, constituting the Accumulated Adjustments Account distribution, and *plus* $513,606.00 in reimbursement of Sellers' tax projected to be paid as a result of the sale. Stock Purchase Agreement, Ex. E [DE-86] Art. 2.

agreement, was advised by Tony Jenkins, Johnson's attorney, but that Johnson also agreed to the cessation of communication. Dep. William Dickerson [DE-88] Ex. 3, pp. 228-29.

Specifically, Dickerson alleges that he warned Johnson that the plan to cease communications with the Jo Brothers was a violation of the security agreement between PMI and the Jo Brothers, and also that ceasing to pay them as required by the promissory notes would result in a lawsuit. *Id.* at pp. 235-36. According to Dickerson, Johnson responded to this warning, saying "I want the Jo brothers to sue me, I can't wait for the Jo brothers to sue me, they'll never get past Piston Manufacturing. You know, the firewall." *Id.* at p. 236. Johnson, in his deposition, denies making this statement. Dep. Vincent Johnson [DE- ], p. 249.[5] The meeting at which this exchange took place occurred, according to Dickerson, a week or two before he was terminated by the company as President. Dep. William Dickerson [DE-88] Ex. 3, p. 228.

Following the breakdown of communications, the Jo Brothers offered to repurchase Custom Molders from PMI. Aff. Hwa-Yong at ¶¶ 27-32. Johnson rejected this offer, and instead, according to Hwa-Yong Jo, agreed to pay the Jo Brothers a discounted amount on the balance owed on the promissory notes within ninety days. *Id.* at ¶¶ 30-31. Although renegotiation of the notes was discussed, and a consulting company was hired to help Custom Molders, no renegotiation actually occurred. Dep. of Hwa-Yong Jo [DE- ], pp. 225-26. At any rate, the payments due on the promissory notes were not made within the ninety day time frame, and PMI ceased making payments to the Jo Brothers around May 2004, at the direction of Serge Thomas, CFO of the Piston Group. Mem. in Supp. of Def.'s Mot.

---

[5] The full deposition of Vincent Johnson will be filed contemporaneously with this Order and provided a [DE- ] number at that time for ease of reference.

for Summ. J. [DE-73], Ex. U, Dep. of Kurt Kushner, p. 37-38. Dickerson, as President of Custom Molders, opined that, at the time Custom Molders stopped making payments to the Jo Brothers, Custom Molders was financially capable of continuing payment. Aff. William Dickerson [DE-85] at ¶ 21.

After Custom Molders ceased making payments on the promissory notes owed to the Jo Brothers, the Plaintiffs commenced their state court action asserting as a cause of action Breach of Contract, upon which Plaintiffs were awarded summary judgment in the amount of $3,936,411.44.

Around January of 2005, Custom Molders was advised that Ford no longer would be sourcing any of its business to the company and would, instead, explore other companies to do the work Custom Molders had been providing to Ford with the production of its Double Barrel Fan Shrouds. Dep. Vincent Johnson [DE- ], pp. 218-222. As a result, Custom Molders began the process of winding down operations as there were "no more business opportunities" for the company from Ford, according to Johnson. *Id.* at p. 222.

At the time that the decision was made to shut down Custom Molders and wind down operations, Custom Molders's most valuable assets appeared to be its patents, valued by Johnson's attorney at an amount between $7 million and $11 million. Dep. Vincent Johnson, p. 190. As agreed by Johnson, although the Tools were owned by Ford, the patent rights themselves belonged to Custom Molders, signifying the security for the Jo Brothers' first promissory note, and, under the security agreement, could not be transferred without the Jo Brothers' approval and consent. *Id.* at 191.

After the decision had been made to wind down the business of Custom Molders, Piston Automotive's then-CFO, Sergus Thomas, advised Johnson not to allow Ford to

transfer the Tools from Custom Molders without paying for the rights. Notice by Plaintiffs [DE-88] Ex. 9, Dep. of Serge Thomas, pp. 171-72. Johnson, however, ultimately caved to Ford's request to transfer the Tools, absent payment by Ford, to Ford's new sourcing company for the Fan Shrouds, Injectronics. Dep. of Michael Bowe [DE-162] Ex. E, pp. 41, 43. The Tools, along with some finished Fan Shrouds, were moved, thereafter, at some point in 2005 from Custom Molders's operation facility to Injectronics, with Ford paying between six and seven thousand dollars for the finished inventory. *Id.* at 42-43. Along with the Tools, the Birth Books necessary for the design of the Double Barrel Fan Shroud also were transferred from Custom Molders to Injectronics without payment by anyone to Custom Molders for those items. Decl. of Curtis Lamar Tucker ¶ 6.

Ultimately, Plaintiffs allege that Johnson allowed the Tools and Birth Books to be transferred from Custom Molders to Injectronics without payment by Ford or authorization of the Jo Brothers because Johnson was more concerned about potential business from Ford for his other companies than getting payment from Ford for the patented items. Notice by Plaintiffs [DE-88] Ex. 9, Dep. of Serge Thomas, pp. 175-76. This, they allege, was a breach of the fiduciary duty owed to them as creditors by Johnson, to which Johnson has agreed. Dep. of Vincent Johnson [DE- ], pp. 116-17, 119-20.

Finally, there is evidence from the record that, following the demise of Custom Molders, the nearly free transfer of Tools and inventory to Injectronics for Ford's Fan Shroud business, and the Jo Brothers' filing of their state court action to recover on the balance outstanding on the promissory note, Piston Automotive was awarded substantial manufacturing business from Ford. This business, among other contracts for Piston Automotive, includes building the Front End Cooling Module for the Ford F-150 truck.

12

Notice by Plaintiffs [DE-88] Ex. 5, Dep. of Steven L. Hayworth, pp. 14-15. The Ford F-150 truck was also the same truck for which the Jo Brothers had anticipated using Custom Molders' Front End Cooling Module. Aff. Hwa-Yong Jo ¶ 18. According to Sergus Thomas, Johnson had been aware of this possibility of future profits from Ford for his other companies when deciding to allow the Tooling from Custom Molders to be transferred to Injectronics without payment for the intellectual property.

According to his deposition testimony, when Thomas warned Johnson not to allow the Tooling to go without first at least being paid for the outstanding work done by Custom Molders, approximately $400,000 worth, Johnson replied that the work that would be coming to his other companies "far outweighs the value of this $400,000 . . . . [a]nd at this point, it wasn't his money, it was somebody else's money, and that he would allow the tools to move against [Thomas's] wishes." Notice by Plaintiffs [DE-88] Ex. 9, Dep. of Sergus Thomas, pp. 175-76.

### III. **STANDARD**

The Defendants in this case have moved for summary judgment, arguing that there are no issues of material fact and that judgment as a matter of law is therefore appropriate. *See* FED. R. CIV. P. 56(c). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec.*

13

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In doing so, the party opposing summary judgment may not rest upon mere allegations or denials; rather, he must show specific facts showing there is a genuine issue for trial. *See Emmett v. Johnson*, 523 F.3d 291, 297 (4th Cir. 2008); *Anderson*, 377 U.S. at 245-52. Summary judgment is, therefore, appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## IV. ANALYSIS

### A. Jurisdiction and Choice of Law

This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), which gives the court diversity of citizenship jurisdiction and 28 U.S.C. § 1441 *et seq* which allowed for proper removal. A federal court exercising diversity jurisdiction under 28 U.S.C. § 1332 must apply the choice-of-law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).

The complaint in this case, originally filed in North Carolina state court and later removed by Defendants to this court, is comprised of two causes of action. The first cause of action is Plaintiffs' effort to pierce the corporate veil of Defendant corporation PMI in order to collect from Defendant Johnson personally on a debt owed to Plaintiffs. The second is a claim for relief for Unfair and Deceptive Trade Practices, alleged under Chapter 75 of the North Carolina General Statutes. As this court sits in the state of North Carolina, the choice of law provisions for each cause of action alleged in Plaintiffs' complaint must be determined according to North Carolina law.

The North Carolina Court of Appeals has noted that "North Carolina courts have not ruled definitively" on whether to apply the veil-piercing law of the state of incorporation or of the forum state. *Strategic Outsourcing v. Stacks*, 176 N.C. App. 247, 253, 625 S.E.2d 800, 804 (2006) (holding that the veil would be pierced under either state's law). A few Court of Appeals decisions have, in summary fashion, applied North Carolina law to pierce the corporate veil of foreign corporations without acknowledging the choice of law issue. *See Excel Staffing Serv., Inc. v. HP Reidsville, Inc.*, 172 N.C. App. 281, 616 S.E.2d 349 (2005) (Georgia corporation); *Copley Triangle Assocs. v. Apparel Am., Inc.*, 96 N.C. App. 263, 385 S.E.2d 201 (1989) (Florida corporation). But a North Carolina federal court has held the law of the state of incorporation to be decisive under the internal affairs doctrine. *Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345 (M.D.N.C. 1995).

Given the federal court's determination in *Dassault*, and the fact that the standards for piercing the corporate veil are extremely similar in both states at issue in this case, this court will apply the law of the state of Michigan, as the place of incorporation of PMI, in evaluating the merits of the Plaintiffs' first cause of action.

### B. Piercing the Corporate Veil

Plaintiffs seek to pierce the corporate veil of Defendant corporation PMI, in order to collect directly from individual Defendant Johnson on their successful state judgment for the balance owed on a promissory note in favor of Plaintiffs for the purchase of Custom Molders. *See* Compl. ¶ 1 [DE-1], Ex. 2. As a general rule, "disregard of the corporate form rests on notions of equity, whether an action is at law or one for equity, and is made in light of the entire spectrum of relevant evidence in a particular case." *Regan v. Carrigan*, 194

Mich. App. 35, 39; 486 N.W.2d 57 (Mich. App. 1992). Accordingly, the analysis of the applicable law depends entirely on the unique facts of each case.

The standard in Michigan for piercing the corporate veil most often has been evaluated as a three part test: 1) the corporate entity must be a mere instrumentality of another entity or individual; 2) the corporate entity must be used to commit a fraud or wrong; and 3) there must have been an unjust loss or injury to the plaintiff. *MI Laborers' Health Care Fund v. Taddie Construction,* Inc., 119 F. Supp. 698 (E.D. Mich. 2000); *SCD Chemical Distributors, Inc. v. Medley,* 203 Mich. App. 374, 381, 512 N.W.2d 86 (Mich. App. 1994).[6]

The first element of veil piercing under Michigan law requires that the corporation be a mere instrumentality or alter ego of the individual or entity against whom relief is now sought. *Foodland Distributors,* 220 Mich. App. 453, 457, 559 N.W. 2d 379, 381 (Mich. App. 1996). The most common of these scenarios typically consists of a plaintiff's allegations that a subsidiary business is not, in fact, separate from its parent corporation, or, as in this case, that a corporation exists and operates entirely under the will and whim of its owner without regard for corporate formalities. Another common avenue plaintiff's argue is that the corporation operates solely or primarily for the individual defendant's personal benefit rather than that of the corporation. It is well settled, however, that the fact that a

---

[6] Although each of these prongs will be analyzed in turn with the facts presented in this case, the court finds it prudent to recount herein and to nod in agreement with the recent commentary of a Justice for the Supreme Court of Michigan regarding the state of the law of veil piercing in Michigan, stating "this Court has never adopted a clear test to determine when piercing the corporate veil is appropriate." *Daymon v. Fuhrman,* 474 Mich. 920, 922, 705 N.W.2d 347, 349 (Mich. 2005) (Young, J., dissenting).

corporation has only one shareholder, alone, does not destroy the corporation's existence as a separate entity from that individual shareholder. *Rymal v Baergen*, 262 Mich. App. 274, 293; 686 N.W.2d 241 (Mich. App. 2004). In other words, no single fact can determine whether a corporation should be held a mere instrumentality of another entity or individual.

Therefore, "in determining whether the corporate entity should be disregarded and the individual held liable on the contracts of its subsidiary because the latter served as a mere instrumentality or adjunct of the former, each case is *sui generis* and must be decided in accordance with its own underlying facts." *Dundee Cement Co. v. Schupbach Bros. Inc.*, 94 Mich. App. 277, 280, 288 N.W. 2d 379, 381 (Mich. App. 1979). Accordingly, the Michigan courts have made clear that the determination of whether a corporation will be deemed a mere instrumentality or alter ego requires a fact intensive, case specific analysis, and often, a trial on those facts. *See id.* Furthermore,

> [i]t is submitted that no mechanical rule based on objective facts of control or connection which will furnish a certain test is possible of formulation. Identity of stockholders, identity of officers, the manner of keeping books and records, the methods of conducting the corporate business as a separate concern or as a mere department of the other concern, may be evidential facts to be considered as bearing on the question of juggling of separate capacities and whether the subsidiary is being in such a way as to make the controlling corporation justly responsible. But after all it comes down to a question of good faith and honesty in the use of the corporate privilege for legitimate ends. If a corporation is owned and controlled by another and is manipulated by the owner for its own purposes and in its own interests to the prejudice of innocent third parties, or the public welfare, it may be necessary to limit such abuse of the corporate capacity or shield.

*Herman v. Mobile Homes Corp.,* 317 Mich. 233, 245, 26 N.W 2d 757, 762 (Mich. 1947) (internal citations omitted.)

17

Here, Defendant Johnson articulates that he formed PMI because he wanted to acquire a manufacturing company and he wanted to call it "Piston Manufacturing Corporation." **Dep. of Vincent. Johnson [DE- ], p. 18. As the corporation's sole** shareholder, officer, and director, Johnson stated that he "doesn't know exactly what [PMI ] did." *Id.* According to Johnson, PMI has never owned any assets, or none besides Custom Molders, nor has it ever engaged in any type of business activity, manufacturing or otherwise, on its own. *Id.* Nor has PMI ever employed anyone. *Id.* at p. 20. The only address for PMI is the same Michigan address shared by the headquarters of all Johnson's corporations and joint enterprises. *Id.* at p. 23. As stated above, PMI was wholly owned by Johnson[7], who served as its sole shareholder, director, and officer. *Id.* at pp. 32-34. Johnson cannot recall that the corporation ever held any kind of board meeting for PMI. *Id.* at p. 33. At some point PMI opened a bank account, evidenced by checks written from it, but Johnson believes any money in any account owned by PMI would have to have been funded either by him "personally or by Piston Automotive" because PMI had no assets of its own. *Id.* at p. 30. Nor is there any evidence from Johnson's deposition or elsewhere in the facts that he was compensated for any of his various roles in the company.

When deposed, Johnson was unable to recount whether PMI had a website, email address, telephone or facsimile number that was different from his other companies. Nor could Johnson recall any expenses PMI may have encountered, where any money PMI possessed originated, whether any money was spent on advertising for PMI, or whether any advertising was ever done for the corporation. *Id.* at pp. 25-30. These facts, when taken

---

[7] At his deposition, Johnson explained that he owns 99% of PMI, with the remaining 1% owned by another corporation of Johnson's, Piston Automotive, of which Johnson owns 100% of the shares. Dep. of Vincent Johnson, [DE- ], p. 33.

18

in the light most favorable to Plaintiffs, indicate sufficient evidence exists to conclude PMI existed as the alter ego or mere instrumentality of Defendant Johnson, in order to satisfy the first prong of the piercing test. *See MI Laborers' Health Care Fund,* 119 F. Supp. 2d 698, 703 (holding that where the individual defendant was the "sole-shareholder, president, vice president, secretary, and treasurer; his compensation not set forth in any document; and he made loans to the corporation" even where he observed corporate formalities, the facts were sufficient "to establish that the corporation was a mere instrumentality" of the defendant.).

As to the oft cited second prong of Michigan's veil piercing test, the "fraud or wrong" component, there is significant case law in Michigan interpreting that element as requiring less than a showing of actual fraud, indicating that "even conduct short of the illegal could support element two." *Id.* at 703 ("Michigan does not require a showing of fraud or illegality before the corporate form will be disregarded.") (citing *United States v. Cordova Chemical Co. of Mich.,* 59 F.3d 584, 597 (6th Cir. 1995) ("While there is no question that fraud justifies piercing the corporate veil, there is ample authority under Michigan law for . . . veil piercing for less egregious unjustified use of the corporate form.")); *see also Papo v. Aglo Restaurants of San Jose, Inc.,* 149 Mich. App. 285, 302, 386 N.W 2d 177, 185 (Mich App. 1986) (recounting the Michigan Supreme Court's repeated assertion that the corporate veil "can be pierced in the absence of fraud."). Given this consistent interpretation in recent case law, this court will apply Michigan's view on the second element to the facts of this case, examining them for wrongdoing, but not requiring all the elements of fraud to be met.

Defendants in this action claim that Plaintiffs improperly pleaded their piercing claim because "an alter ego claim is not even, by itself a cause of action." Def. Mem. in Supp.

Sum. J. [DE-73], p. 15. Michigan courts have allowed an action for piercing the corporate veil to stand, however, where the action is sought in order to collect on a previous, or pending, judgment for breach of contract. *See Papo*, 149 Mich. App. at 302 (acknowledging that a breach of a lease was sufficient to satisfy the second prong of Michigan's piercing test). In fact, at least one federal court interpreting Michigan law allowed a breach of contract to be sufficient to satisfy the second prong. *See Sirvo Kinetics*, 475 F.3d at 799-800 ("Turning to the second element, we hold that, assuming that a jury concluded that SKI could recover for breach of contract, this breach would constitute a "fraud or wrong" for the purpose of veil-piercing liability.").

Here, it is undisputed that Plaintiffs were successful in their breach of contract claim in a North Carolina state court, winning summary judgment against Defendant PMI for failure to pay the balance owed to Plaintiffs under a promissory note. The state court judgment awarded Plaintiffs the balance of the sum owed, $3,936,411.44, plus attorneys' fees. Compl. [DE-1], Ex. 5 Summ. J. Defendants argue that the decision not to pay the balance owed to Plaintiffs was merely a "legitimate business decision," and is therefore insufficient to establish that the company was used for a fraudulent or wrongful purpose in order to pierce the corporate veil. Def. Mem. in Supp. [DE-73], p. 21. The facts set forth in this case, however, reveal much more than a mere business decision not to pay a debt.

From the facts, Johnson is shown as the owner of at least two companies. One of Johnson's companies, the Defendant PMI had very little profitability outside of servicing Ford's plastics orders, orders that were processed by and through Custom Molders, once the manufacturing company had been purchased from the Jo Brothers by PMI. Def. Mem. in Supp. Summ. J. [DE-73], Ex. Q. Meanwhile, the other of Johnson's companies, Piston

Automotive, was becoming increasingly dependent on Ford with each passing day. Dep. of Vincent Johnson [DE- ], pp. 200-01. At some point following PMI's purchase of Custom Molders, Ford ceased outsourcing any new business to Custom Molders. *Id.* at p. 219. From the facts before the court, it appears that Johnson recognized if Ford was going to outsource the Double Barrel Fanshroud business (previously performed by Custom Molders) to another company, that Custom Molders should be compensated for its intellectual property responsible for the creation of those parts. *Id.* at pp. 221-22.

As previously stated, the intellectual property responsible for the creation of the Double Barrell Fanshroud had been evaluated by a patent attorney hired by Johnson to be worth between seven and eleven million dollars, and pragmatically constituted the security for the Jo Brothers' promissory note from PMI. According to Johnson, Ford offered $1.1 million for the rights to the intellectual property, which Johnson "thought was ridiculous" and rejected. *Id.* at p. 223. Later, discussions were had between Custom Molders and Injectronics about a possible sale of Custom Molders to Injectronics in order to avoid patent infringement, as the latter would soon begin producing for Ford the parts once produced by Custom Molders. *Id.* at p. 230. No sale, however, ever took place.

Instead, against advisement from Piston Automotive's then CFO Sergus Thomas, Johnson ultimately allowed Ford to come into Custom Molders and remove the tooling, birth books, and other equipment used to make the Double Barrel Fanshrouds for transport to Injectronics, without compensation to Custom Molders. In fact, Sergus Thomas required anyone taking Tools from Custom Molders to sign a statement that "they were removing the goods and the tools in violation of any intellectual property rights that [Custom Molders] had and/or owned." Notice of Plaintiffs [DE-88] Exh. 9, Dep. Sergus Thomas pp. 156-57.

Thomas also recounted implicit threats to Piston Automotive that Ford would not be amenable to future business with Johnson's companies "unless [the] wind-down [went] well" with Custom Molders. *Id.* at p. 145. According to Thomas, Johnson was assured by Ford representatives Michael Bowe, Ann Carter and Eddie Floyd, that as long as things went smoothly with the uncompensated transfer of the Tooling and intellectual property from Custom Molders to Ford's new supplier, Johnson and Piston Automotives would be taken care of by Ford in the future. *Id.* at pp. 136; 144; 153.

Therefore, as Defendants' contend, it is true that Johnson made a business decision, several in fact. By his own admission, Johnson knew that he had a fiduciary duty to the Jo Brothers as creditors, Dep. of Vincent Johnson [DE- ] pp. 116-17, 119-20, and that the patents owned by Custom Molders were intertwined with the very Tooling he allowed Ford to take from Custom Molders, which is why he discussed a purchase of the rights by Ford, and a purchase of Custom Molders by Injectronics. *Id.* at p. 144. Ultimately, however, as Johnson explained, he did "not want to tarnish any relationship with" Ford, who he described as an "800 pound gorilla" against whom he couldn't "win those battles." Dep. Vincent Johnson [DE- ], pp. 200-201. Additionally, according to Sergus Thomas, even the $400,000 owed to Custom Molders by Ford for work already completed was not enough to convince Johnson to push back to assure some payment to company's creditors. In his deposition, Thomas alleges Johnson stated the work that would be coming to his other companies from Ford "far outweighs the value of this $400,000 . . . . [a]nd at this point, it wasn't his money, it was somebody else's money, and that he would allow the tools to move against [Thomas's] wishes." Notice by Plaintiffs [DE-88] Ex. 9, Dep. of Sergus Thomas, pp. 175-76.

Thus, from the facts, it is clear that Defendant's conduct amounted not only to a business decision not to pay a creditor on a debt owed, but also made it impossible for the debt owed to Plaintiffs to be paid, by allowing the most valuable assets, the only assets, owned by Custom Molders to be taken without profit to Custom Molders, hoping for a future gain for his other companies, as had been impliedly promised by Ford. Taken in the light most favorable to the Plaintiffs, these decisions by Johnson present significant evidence upon which to find a wrong sufficient to satisfy the second element of Michigan's piercing test.

The third and final element of the Michigan piercing test asks whether there has been unjust loss or injury to the Plaintiff. *Foodland Distributors*, 220 Mich. App. 453, at 460, 559 N.W.2d 379, 382. As explained above, in the light most favorable to the Plaintiffs, the evidence displays that the conduct of Johnson leading up to and during the wind-down of Custom Molders, led to the loss of Custom Molders's most valuable assets, its intellectual property, property valued between $7 and $11 million representing the Plaintiffs' security interest in the unpaid promissory note. Johnson's decision not to see that Custom Molders was compensated for its intellectual property in an attempt to benefit his other companies, resulted in a direct and unjust loss to Plaintiffs such to satisfy the final element of Michigan's test for piercing the corporate veil.

## C. Unfair and Deceptive Trade Practices

Plaintiffs' second cause of action alleges violations of North Carolina's Unfair and Deceptive Trade Practices Act. N.C. Gen. Stat. § 75-1.1 *et seq.* ("UDTPA").[8] To establish a claim for unfair and deceptive trade practices under North Carolina law, Plaintiffs must show: 1) that Defendants committed an unfair or deceptive act or practice, 2) the action in question was in or affecting commerce, and 3) that the act proximately caused injury to Plaintiffs. *See Bob Timberlake Collection, Inc v. Edwards*, 176 N.C. App. 33, 41 (citing *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 664, 464 S.E.2d 47, 58 (N.C. App. 1995)). An act or practice is unfair if it "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403, (N.C. App. 1981). An act or practice is deceptive if it "has the capacity or tendency to deceive." *Id.* Furthermore, "[a]lthough the ultimate issue of whether a particular act or practice violates [UDTPA] is one of law for the court, disputes over the facts on which such a legal decision is based are for the trier of fact." *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 534 (4th Cir. 1989).

Here, Plaintiffs argue that the unfair and deceptive act committed by Defendant Johnson was his deliberate sacrifice of Plaintiffs' security, the intellectual property encompassed by the items taken by Ford with Johnson's consent, for Johnson's "own

---

[8] Although neither Plaintiffs nor Defendants broach this issue with the court, an application of the choice of law rules of the forum state, North Carolina, would require this court to apply the substantive law of North Carolina to the Plaintiffs' cause of action for Unfair and Deceptive Trade Practices. Under either the traditional *lex loci* standard or the modern "most significant relationship" standard – North Carolina courts have applied both – North Carolina's would be the appropriate unfair and deceptive trade practice law to apply under these facts. *See e.g. Uniden Am. Corp. V. Ericsson, Inc.*, 1998 U.S. Dist. LEXIS 8149, *17-18 (M.D.N.C. March 13, 1998) (compiling North Carolina cases in which both tests were used when determining the applicable unfair and deceptive trade practices law).

pecuniary gain." Pl.'s Mem. in Opp. [DE-83] p. 29. Defendants argue, however, that Plaintiffs' UDTPA claim arises out of Johnson's failure to pay the balance owed Plaintiffs under the promissory note, and as such is a mere breach of contract and insufficient basis for a claim under Chapter 75. Under North Carolina law, actions for unfair and deceptive trade practices arising out of a breach of contract also must show, in addition to the three elements listed above, substantial aggravating circumstances in order to prevail on a claim under North Carolina's UDTPA. *See Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 62 418 S.E.2d 694, 700 (N.C. App. 1992). In other words, mere, or even intentional breaches of contract alone do not suffice to create meritorious UDTPA claims. *Bartolomeo v. S.B. Thomas, Inc.,* 889 F.2d 530, 535 (4th Cir. 1989).

Although Defendants argument is based on a correct statement of the law of North Carolina, each of the cases cited by the Defendants to support the assertion that the court must find evidence of substantial aggravating circumstances involved a claim for a breach of contract that was current and pending at the time the claim for UDTPA was brought. Here, however, Plaintiffs have not asserted a claim for breach of contract, indeed, the breach of contract claim previously was adjudicated by the state court judgment awarded in Plaintiffs' favor in March 2005. [DE-1] Exh. A Part 4. In the current action, Plaintiffs seek to enforce the judgment awarded as against Defendant Johnson individually for his actions *following* the breach of contract, actions occurring after the inception, and possibly even the judgment, of the original action. As such, the court does not find it appropriate to analyze this case for substantial aggravating circumstances in addition to its determination of whether an unfair or deceptive act occurred.

As to that initial determination, whether the act constituted an unfair or deceptive trade practice, North Carolina courts have held a practice to be unfair if it is unethical or unscrupulous, offends public policy, is immoral, oppressive, or substantially injurious to consumers, and deceptive if it has the capacity or a tendency to deceive. *See Polo Fashions, Inc. V. Craftex, Inc.,* 816 F.2d 145, 148 (4th Cir. 1987) (citing *Marshall v. Miller,* 302 N.C. 539, 276 S.E.2d 397, 403 (N.C. 1981). Accordingly, the court finds that, in the light most favorable to the plaintiffs, there exists a genuine issue of material fact upon which the trier of fact may find sufficient evidence to support a determination of law by the court that the Defendant Johnson committed an unfair or deceptive act. Specifically, Johnson's alleged decision to allow the Tools, Birth Books, and other materials signifying intellectual property used to secure the Jo Brothers' promissory note, to be removed from Custom Molders without payment or compensation, equates to an act that might be construed as, at the very least, unethical and unscrupulous conduct, amounting to an unfair or deceptive act under the statute under circumstances of this case.

The second element of UDTPA requires that the act be "in or affecting commerce." N.C. Gen. Stat. § 75-1.1. The General Assembly amended this subsection to define commerce as including "all business activities, however denominated." *Id.* Therefore, although the Defendants argue that this case is not one "in or affecting commerce" because "Plaintiffs have not presented any allegations that even remotely suggest that the actions Defendants allegedly undertook affected anything or anyone but themselves," Def.'s Memo. in Supp. [DE-73] p. 25, North Carolina courts have made clear the statute is meant to apply "to dealings between buyers and sellers at all levels of commerce." *United Virginia Bank v. Air-Lift Associates,* 79 N.C. App. 315, 320, 339 S.E.2d 90, 93 (N.C. App. 1986); *see also*

*United Roasters, Inc. V. Colgate-Palmolive Co.,* 485 F.Supp 1041, 1046 (E.D.N.C. 1979). Here again, Defendants' arguments appear to be based upon the belief that this action is premised on a mere , or even intentional breach of contract. As explained above, however, the current action, if viewed on a time continuum, came after the breach of contract, and the conclusion of the following state court litigation therefor.

Furthermore, as set forth by the Plaintiffs, Defendant's decisions following the removal of the Tools and equipment from the company did affect parties beyond those involved in the immediate suit. Defendant's actions allegedly resulted in the ultimate loss of jobs for "approximately 275 Custom Molders employees." Hwa Jo Aff. ¶ 40-41. Therefore, the allegations and facts presently available to the court provide sufficient evidence, when taken in the light most favorable to the Plaintiffs, that the acts of Defendant constitute acts "in or affecting commerce" as intended by the broad application of the North Carolina statute.

The final element of North Carolina's UDTPA requires a determination of whether the allegedly unfair or deceptive act "proximately caused an actual injury to the plaintiff or his business." *Wysong & Myles Co. v. Employers of Wausau,* 4 F.Supp. 2d 421, 433 (M.D.N.C. 1998). Here, there exists a genuine issue of material fact as to whether Johnson's acts – allowing the Plaintiffs' loan security, and the company's only viable assets (the Tools and Birth Books) to be removed from PMI without compensation – proximately caused the Plaintiffs' injury. As explained in depth above, the Patents, with the novelty thereof arguably embodied by the Tools themselves, held a worth of somewhere between $7 million to $11 million. Dep. of Vincent Johnson [DE- ], p. 190. Therefore, Johnson's decision to allow the Tools and other materials to be removed by Ford without compensation, knowing the Tools then would  be used by Injectronics to create the very product protected by the

Patents owned by PMI, was a decision that a jury could find proximately caused injury to the Plaintiffs, namely, their inability to recoup any part of the state court Judgment against PMI.

More specifically, the state court Judgment awarded to the Jo Brothers was a result of the lawsuit for breach of contract by PMI, a lawsuit brought when PMI still was in possession of the Patents and Tools, and thus, a lawsuit premised on the belief that PMI (and therefore, Custom Molders) had assets amounting to at the very least $7 million, more than enough to cover the balance due the Jo Brothers under the Promissory Note in default. Accordingly, it is not the Defendants' breach of contract that constitutes the act upon which the Jo Brothers base their current causes of action, rather, it is Johnson's alleged intention and individual acts in deciding to relinquish the only assets owned by PMI for his own personal gain – acts occurring after the commencement of the successful state court action for breach of contract – from which a jury could determine the Plaintiffs' injury was proximately caused.

## V. **CONCLUSION**

Based on the foregoing, it therefore is ORDERED that the Defendants' Motion for Summary Judgment [DE-72] hereby is DENIED. Accordingly, the court has reviewed the parties' Joint Notice of Proposed Pretrial and Trial Dates [DE-170], and the pretrial conference is set for September 8, 2009, with the trial to commence on October 5, 2009 or as soon thereafter as the court may reach it.

The Clerk of Court is DIRECTED to file on the record the full depositions of Hwa-Yong Jo, Vincent Johnson, and the July 10, 2008 Videotaped Deposition of Sergus Thomas, all referred to herein.

SO ORDERED.

This the 2nd day of June, 2009.

_____
JAMES C. FOX
Senior United States District Judge